CARR, J.
The instruction of the circuit court as to the proper standard of damages, presents the only point on *which this court is called to decide; and a most important point it is, entering into almost every sale of real estate. It was argued at the bar, as an open question ; and, I think, properly; for, though ill Mills v. Bell, 3 Call, 320; Nelson v. Matthews, 2 Hen. & Munf. 164, and Humphreys’s adm’r v. M’Clanahan’s adm’r, 1 Munf. 493, the point was incidentally touched, it was certainly not before the court, nor at all involved in the decision of those cases. It is a settled rule, that these obiter dicta cannot be received as authority; a rule founded in sound reason, and, instead of detracting from the respect due to judges, necessary for the preservation of that respect; for when the mind is deeply engaged in the investigation of a particular subject, we know how eagerly we seize on any position, which strikes us as illustrating it, by analogy or otherwise, without inquiring into the correctness of such position, or following out its consequences, with that care and accuracy of discrimination, which we feel bound to bestow on the main question. There is another case, Stout v. Jackson, 2 Rand. 132, in which this question was before the court, and elaborately argued by the judges: but there, the court consisted of three members only, and one dissenting, the judgment, according to our rule, does not settle the law.
In considering this subject, it seems proper to look back to the course of proceeding upon the ancient warranty, where the land was lost by eviction; for, though that course has long since become obsolete, it may reflect some light upon our path. We are told by Coke, 1 Inst. 365, a. that “a warrantie, is a covenant real annexed to lands or tenements, whereby a man and his heirs are bound to warrant the same, and either upon voucher, or by judgment in a writ of warrantia chart®, to yield other lands and tenements to the value of those that shall be evicted by a former title.” The value, at what time? All the old books tell us, at the time when the warranty was made. Thus Bracton (Lib. 5, cap. 13, $ 3), says, Si autem de excambio fieri debet extensio et estimatio, estimari debet res quae amittitur, in eo *statu in quo fuit quando primo data fuit. Non enim admittitur melioratio tenentis qui amisit, ut si post feoffamentum suum, ipse vel antecessores sui ibi ampia construxerit aedificia, sicut castra, parcos vel vivaria. Thus Viner, vol. 22; Voucher, T. b. pi. 1, 2, p. 145, “a man shall recover in value, according to the value of the land at the time of the Warranty made;” “as if the land be of greater value than it was at the warranty made, by finding of a mine of lead or tin,' he shall not render in valtte according to that, but as it was at the warranty made;” and he cites 19 H. VI. 46, 61; 3 E. III. 14, b. “So, if improved by building or otherwise;” Br. Voucher, pi. 69. “If the tenant be impleaded and vouches me, and at the grand cape ad valentiam, I come and cannol bar the demandant, I shall take issue with the tenant, of what value the land was at the time of the warranty, and shall not render more in value.” Id. Ibid. “In no case was land, taken by purchase at all liable, nor was a person bound to warranty beyond the value of the land at the time of the donation. ” 1 Reeve’s Engl, law 448; Ballet v. Ballet, Godb. 151, was a case of warrantia chart® in the time of James I. and on demurrer, the court held, that if there be new buildings, of which the warranty is demanded, which were not at the time of the warranty made, and the deed is shewn, the defendant ought not to demur, but shew the special matter, and enter into the warranty for so much as was at the date of the deed, and not for the residue. I might cite other authorities, but it is useless to incumber the case with them: the doctrine is settled beyond all question, that the warrantor was liable only for the value of the lands lost, at the date of the warranty; and that he rendered that value in lands valued at the date of the eviction. This last is clear from all the forms of the writ of habere facias ad valen-tiam to be found in Raslall, Bracton &c.
Thus stood the law, while the ancient covenant real, the technical warranty, prevailed in the transfer of real estate; but that has long since given way to covenants personal, introduced *into more modern conveyances, such as covenants of seisin, for quiet enjoyment &c. &c. These have rendered the remedy more simple, as well as more efficient; for they bind the personalty, as well as the realty. Thus Blackstone (vol. II. p. 304), *394 tells us, “If he (the vendor) covenant for his executor and administrators, his personal assets, as well as his real, áre pledged for the performance of' the covenant, which makes such covenant a better security than any warranty; and it has therefore in modern practice, totally superseded the other.” But have these personal covenant? abrogated also the fixed and settled rule of the common law, with respect to the measure of damages? Have they established the value at eviction, as the standard, instead of the value at the warranty? Where is the evidence of this? I have looked for it in vain : I cannot find a trace of it in any elementary writer or reporter in England. Is not this, though negative evidence, strong to disprove the existence of such a change? When Blackstone, for instance, was speaking of the preference of these personal covenants, in the increased security they furnish, is it conceivable that he would have omitted to notice a change still more important, which they had effected, in destroying the old standard of damages, and erecting a new one? It belonged directly to the subject he was treating. Where are we to look for the common law, but in the opinions of the judges, and the treatises of learned men? In these depositories we find abundant evidence of the old rule, but not a vestige of the new one; nothing which indicates a change: on the contrary, the english cases which I have found, subsequent to the introduction of personal covenants, though few and meager, do, so far as they go, support the ancient rule. Thus, in Pomery v. Partington, 3 T. R. 665, one holding under a will which gave a power of leasing part of the estate, demised to P. for ninety-nine years, a moiety of the tithes of corn and grain in St. Uyot in Cornwall. On the death of the lessor, the heir general of the devisor brought ejectment against P. and recovered the tithes. P. *sued the executors of his lessor on the covenant of title in his deed. On the trial at nisi prius, the jury found a verdict for the plaintiff, subject to the opinion of the court upon a special case. The main question argued before the court of king’s bench, was, whether the power in the will authorised a lease of the tithes? The court decided that it did not. The question then arose, whether P. should recover £30. which he had paid for the lease, and the costs of the ejectment, which would amount to ¿125. 17. 2. or whether the measure of his damages, should be the value of his interest in the term at the death of his lefesor, which with the costs of the ejectment would amount to £500. The court said, that unless the counsel agreed upon the sum to be taken as damages, they must send the cause back to a jury to have the quantum of damages assessed; but as far as they could hint any opinion on the subject, they thought that the plaintiff ought - only to take the smaller sum: on which it'was agreed that the verdict should be entered for the £125. 17. 2. This case shews, that the old rule was recognized both by court and bar, as the true one. And if it be urged, that there was neither an argument at the bar, nor a regular opinion of the court on the point, I answer, this is evidence that it was thought too clear and too well settled for argument. Can we suppose, that if the question had been considered either new or doubtful, ,the counsel for the plaintiff would have surrendered three fourths of the damages they claimed, upon the mere suggestion of the opinion of the court? Again: In Flureau v. Thornhill, 2 W. Blacks. 1078, Elureau, at an auction, bought a rent of £26. 1. 0. per annum for a term of thirty-two years. It was knocked down to him at £270. and he paid as a deposit £54. On looking into the title, the defendant could not make it out, but offered to the plaintiff either that he might take the title such as it was, or receive back his deposit, with interest and costs; but the plaintiff insisted on a further sum for damages in the loss of so good a bargain. The jury, contrary to the direction of the judge, gave a ver-diet *for £74. 15. 6. allowing ,£20. for damages. On a motion for a new trial, De Grey, C. J., said, “I think the verdict wrong in point of law. Upon a contract for a purchase, if the title proves bad, and the vender is, (without fraud,) incapable of making a good one, I do not think, that the purchaser can be intitled to any damages for the fancied goodness of the bargain, which he supposes he has lost.” The other judges were of the same opinion, and a new trial was granted. This case, though different in circumstances, seems to me to recognize the same principle which governed Pomery v. Partington. I will cite one other case, Lewis v. Campbell, 8 Taunt. 715; 3 B. & A. 392; 4 Eng. com. law rep. 258; 5 Id. 322. Barclay demised certain premises to Campbell, for twenty-one years: Campbell assigned Ms interest to Corp, who assigned to the plaintiff. Upon the assignment by Campbell to Corp, he covenanted with Corp and his assigns, for the quiet enjoyment of the premises. Barclay afterwards, for a forfeiture of the term, incurred by Campbell, entered upon and ejected the plaintiff, who sued Campbell upon his covenant for quiet enjoyment. In his declaration, the plaintiff stated as his damages, 1. the loss of the premises: 2. the sum of £300. which he had been forced to expend in endeavouring to defend his possession : 3. other large sums, expended in altering, improving and ornamenting the premises; in all, amounting to £2000. At the trial, it was proved, that the plaintiff had made several additions, consisting of coach houses, and out buildings, and had converted the lands into pleasure grounds; that the value of the property at the time of the assignment to Corp was .£300. and that the value of the additions and alterations was £450. The jury having found a verdict for £750. it was objected, that the plaintiff could not recover more than the value of the premises at the time of the defendant’s assignment to Corp; and this question was reserved for the opinion of the cour):. On the argument in bank, two points were made;l. whether this was a covenant running with the land; 2. whether the verdict ^should not be reduced to £300? The court decided that it was a covenant running with the land: and Dallas, C. J., *395 said, 1 ‘Then as to the second point, I very much doubt, whether in any case, plaintiff can recover for the improvements and buildings he may choose to make and erect upon the land ; but whether damages in respect of money expended in such improvements and buildings, can or cannot in any case be recovered, I am of opinion, that they cannot be recovered in this case, as the declaration is insufficient.” All the court were of opinion to reduce the verdict to ,£300. the other judges going upon the insufficiency of the declaration, without speaking to the point generally. These are the cases I have met with in the english books: their tendency certainly is, to support the rule so clearly shewn to have been established under the old technical warranty. Upon the ground of authority, then, it seems to me, that we ought to receive this rule as a part of the common law.
But suppose this not so, and we were now about to establish a rule as to compensation for eviction of real estate, what would be the best and safest rule, looking at the same time, to a just exposition of the covenants in the deed, and the general convenience of the community’ I strongly incline to think it would be, the purchase money with interest, and the costs of eviction ; I mean, interest for such time as the covenantee is liable, on eviction, to be called on for rents and profits; for so long as he receives these to his own use, they stand instead of interest. We have seen that under the old covenant real, the rule’was, the value of the land lost at the date of the w’arranty. Upon what ground was this so settled? It was not, that the ancient warranty was less comprehensive in its terms than the modern covenants: the warrantor bound himself to defend the land to the warrantee, his heirs and assigns, against the claims of all persons whatever. It was not, that feudal principles governed the decision : they, perhaps, so far operated as to make it a recover}’ in kind, land for land; but they could not at all have influenced the question, whether the land should be valued at the date ‘x'of the warranty, or the eviction. Why then was it restricted to the date of the warranty? I concur with chief justice Tilghman, who says, in Bender v. Fromberger, 4 Dall. 443. “The reason appears to be, that the intention of the parties was so understood, that, the warranty should be limited to the value oi the land, at the time of the executing the deed.” If we consider the personal covenants (of good title, for quiet enjoyment, to warrant and defend the premises &c.) as inventions of the legal profession (which they no doubt were), what reason have we to suppose, that they meant to change the ancient rule? They found it established: they were habituated to it: they have used no words in the new covenants which indicate an intended change. Those covenants are not larger: they bind the personal estate, it is true, but not to answer damages larger or smaller, or in any manner different from the covenant real. But stripping the contract of its legal clothing, what is it that the parties, the vendor and vendee, mean? When land is sold, the existing state of things, the present value and situation of j the land, are the subjects in the minds of the parties: it is this land as it now is, that is bought and sold and warranted. Is it not most natural, then, to suppose that the parties mean, that the purchase money, the standard of value to which they have both agreed in the sale, shall be the measure of compensation if the land be lost? They seldom look into futurity to speculate upon the chances of a rise or fall in value. If they did, the views of buyer and seller would probably be very different; and, whatever they might be, could form no part of the contract, nor enter into its construction. What is it that the seller warrants? the land itself. Does this warranty, either by force of its terms, or by the intention of the parties, extend to any future value, which the lands may reach, when they have become the site of a populous city, are covered with expensive buildings, or mines of gold have been found in their bowels? such a state of things was probably not dreamed of. And how can these subsequent accessions be the subject of a warranty, made when they had no existence, nor were ever in the contemplation of the parties?
*But let us look at the rule, with an eye, to public convenience. This is by far the most important point of view. It is much better for the community, that a rule should be simple, clear and certain, than that it should attain exact justice. Upon the subject before us, we can establish no general rule, which will not, in particular cases, operate hardly. Those who contend for the value at eviction, as the best rule, do not, I believe, extend it to all cases; if so extended, it would be harsh beyond endurance. Numerous cases may be stated, where a party selling what he considers a barren worthless piece of ground for a trifling sum, may be called on for tens of thousands of dollars, and overwhelmed with ruin. ButThe difficulty here is, that if you do not go the whole length of the principle, you can have nothing like certainty. Sa}r, for instance (with Justinian), that cases of extraordinary increase, and of very expensive improvements, shall be excepted from the rule; how will you draw the line? how present to buyers and sellers, that fixed standard, by an appeal to which they may ascertain, to what amount they will be bound, in any warranty they may make upon a contract of sale? it is impossible. A rule, thus surrounded with difficulty, danger and uncertainty, cannot be a safe one for the community. Look, then, at the rule of the common law ; the purchase money, with such interest as is before stated, and the cost of the suit, by which the vendee was evicted. Here all is simple and certain. The vendor sells for a certain sum, and believing his title perfect, he warrants: all this is done in good faith (for if there be fraud or concealment the rule is different) : the purchaser has precisely the same means of ascertaining the soundness of title, as the vendor: he may call in counsel to examine the chain of title. The parties know what to count on : if there shall be an eviction, at whatever time, the vendor knows what he is to pay ; the vendee, what he is to receive. If the vendee does *396 not choose to rely on the common covenants, but to be secured also for the increase in value of the land, and any improvements he may put on it, let him insist on particular Covenants, expressly guarantying to him such increase and improvements?
I think, upon the whole, that in all cases where the parties have relied on the usual covenants only, the best and safest rule is, the purchase money with interest (as before qualified) and costs of suit. And I rest on this conclusion with tenfold confidence, when looking to the different states, I find their able and enlightened judges (so far as I have seen their decisions) coming to the same conclusion, with the exception of two states only. In Kentucky, see Cox v. Strode, 2 Bibb, 279; Booker v. Bell, 3 Id. 177. In Tennessee, Talbot v. Bedford, Cook’s Rep. 447. In South Carolina, some early cases were contrary; but in Furman v. Elmore, 2 Nott and M’Cord, 189, the court of appeals of that state took up “the subject, and after an elaborate discussion, established the common law rule: and in Ware v. Weathnall, 2 M’Cord, 413, the doctrine was again examined, and-the point considerd as settled. In North Carolina, the case of Phillips v. Smith, 1 No. Carolina Repos. 475, establishes the same rule. In Pennsylvania, in the case of Bender v. Fromberger, 4 Dall. 441, the subject was investigated with great learning and ability, and the common law rule settled. And it was approved in New York, after very profound examinations of the subject, in Staats v. Ten Eyck, 3 Cain, 111, and Pitcher v. Livingston, 4 Johns. Rep. 1. The exceptions are Massachusetts and Connecticut: Gore v. Brazier, 3 Mass. Rep. 543, and Horsford v. Wright, Kirby’s Conn. Rep. 3. In both these cases, the judges admit the common law rule to be as I have stated; but, in the first, chief justice Parsons goes upon the early and settled practice of the state, a legislative interpretation &c. and, in theTast, the court puts it on the 'practice simply. I think the judgment should be reversed.
GREEN, J.
Some objections unconnected with the principle assumed by the instruction excepted to, were made at the bar to the finding of the jury. It was said, that the *proofs set out in the bill of exceptions, only shewed an eviction of two thirds of the premises, and that the damages assessed obviously embraced the whole. I do not think we can notice the objection here, as it was not made in the court below, and, especially, as the declaration alleges an eviction of two thirds by judgment, and of the residue by the entry of one having a superiour title, and the bill of exceptions states that it was proved, that, a short time after the dissolution of the injunction in 1816, Eitzhugh was ousted from the possession of the land, in general terms. If the legality of the entry made under the superiour title, as to the one third not recovered in this ejectment, was intended to be questioned, it should have been done in some more distinct form.
Erom the exceptions it appears, that none of the covenants of Threlkeld’s deed were broken, except that of warranty; for he and his wife were seized of a fee simple esiate, and had full power to convey it; nor was there any former gift &c. or incum-brance of or upon the land, made or suffered thereon afterwards by them, or any other: so that the case presents in the simplest form, the question discussed in Stout v. Jackson, 2 Rand. 132, as to the proper measure of damages, for the breach of a covenant of warranty. I have reconsidered that question, and my opinion remaining unchanged, I shall add but little to what I said on that occasion.
Since the decision of that case, I have met with that of Pomery v. Partington, 3 T. R. 665, (which, though as far as I recollect, it has not been cited in any of the american cases upon this subject, seems to me to have a strong bearing upon the question,) and the case of Campbell v. Lewis, 8 Taunt. 715. [He stated the circumstances of those cases, very particularly.] I think the clear inference from these cases is, that in Westminster hall this question was considered as settled beyond any reasonable doubt, and that the value at the time of eviction never occurred either to court or counsel, as affording the proper criterion of damages. *The counsel for the plaintiff, in the first case, claimed the value at the time when the title, which was good for the life of the lessor, failed by his death, and when the plaintiff became liable to eviction, and referred not at all to the time of eviction. This value, without interest, although many years had elapsed since the death of the lessor and the subsequent eviction, together with the costs of the ejectment, was all he asked for his client. He readily yielded three fourths of that claim to the slight suggestion of the court. The rule adopted for the adjustment of the damages, was, to allow the costs, added to the price given for the property, with interest thereon from the time when the title of the lessor, and of course that of the lessee, ceased, and the latter became accountable to the true owner, for the profits, which he might have subsequently received; stopping the interest at the time of the actual eviction, namely, the time of rendering the judgment in the ejectment (which being for the recovery of an incorporeal hereditament, virtually executed itself) and not carrying on the interest up to the time of the judgment in the action of covenant, although many years had intervened between the two judgments. I have supposed, that the interest on the purchase money, was allowed only from the time of the lessor’s death, though the report of the case is silent as to the time from which it was allowed; because there can be no conceivable reason, why interest should have been allowed during the life of the lessor, since the lessee during his life, had and enjoyed, without being answerable for the profits to any one, an absolute and indefeasible right to the titles under the lease.
The case at bar, in which the value of the land has not been increased by improvements in buildings, or by cultivation, or by any accidental circumstance, other than the gradual increase in the value of lands generally, is very well adapted to the practical illustration of the principle, upon *397 which damages should be estimated in cases of warranty and eviction. The purchaser from Threlkeld, and *those claiming under him, enjoyed the profits of the land from 1780 to 1816, by virtue of his deed, and their possession acquired and held under it only, and for a greater part of that time (as long as Threlkeld’s marital rights existed), with a clear title, and irresponsible to any one for the rents and profits received during that part of the time. Neither does it appear, that they have been subjected to the payment of any part of the rents and profits to" the successful claimants : indeed, if no suit was brought against Fitzhugh or his executrix for profits, before the institution of this action (in 1823) they were then completely protected from any future demand on that account, by the statute of limitations, unless any of the claimants fell within some of the exceptions in the statute. Supposing the annual profits of the land to have been equal to the legal interest on its value, let us see the effect of the principle adopted by the circuit court, and ascertain the gain and loss of the purchaser, in consequence of the purchase and eviction. The average value of the land, from 1780 to 1808, was forty shillings, and afterwards ten dollars per acre: and in May 1798, the legal rate of interest was increased by one per cent. Upon these data, the purchaser was out of pocket, the amount of the purchase money and interest (allowing the intermediate increase in the rate of interest) at the time of the actual eviction in 1816, 882 dollars 73 cents; and he had received profits to the amount of 1313 dollars' 8 cents; a difference arising from the increase of the rate of interest, and of the value of the land, both operating in his favor: in addition to which, the principle adopted by the circuit court gave him to be paid by the vendor, the value of the land in 1808, at ten dollars per acre, with interest thereon from October 1808, amounting to 1724 dollars 80 cents; making in all 3037 dollars 88 cents, more than three times as much as his actual loss, except the costs which he had expended in defending the title.
In Stout v. Jackson, I had occasion to collect and refer to many cases, shewing that after the statutes in England, *a llowing costs and damages in real actions, the warrantee upon voucher on warrantia chartae, was entitled upon eviction, to recover not only the value of the land, as it was at the time of the warranty made, but the damages recovered against him, which damages included costs, for they were considered as damages, and assessed with them. And this is, in general, all that the warrantee can be said to have lost, in consequence of the warrantor failing to maintain his title, and the only loss that can be in the contemplation of the parties when they enter into their contract.
I think, therefore, that this judgment should be reversed, with a declaration, that the true measure of damages, is the value of the land at the time of the conveyance made in 1780, to be ascertained by the price given, if no better proof be offered, with interest thereon from the time Fitzhugh was actually evicted, (not by the judgment of 1808, for that was no eviction, he continuing still to hold and enjoy the land under Threlkeld’s deed; but by the actual entry of the true owners after the dissolution of the injunction) and the costs incurred by him in defending his title, and also any damages which may have been recovered against him, by those who evicted him, or which they may be now shewn to be clearly entitled to recover against his estate.
COALTER, J.
I have the misfortune to differ from all my brethren upon this interesting question. My view of the subject was very fully stated in the case of Stout v. Jackson. My opinion remains unchanged. And I have nothing material to add to the reasoning upon which the opinion I entertained in that case (and still entertain) was founded.
CABELL, J.
This case presents the important question discussed in Stout v. Jackson, as to the proper standard of damages, in an action of covenant for the breach of a covenant to warrant and defend the title of land sold and conveyed in fee simple; whether the proper standard be the value of the land, at the time of the sale, or at the time of the eviction?
*As the covenants inserted in modern deeds, were introduced as auxiliary to or substitutés for the ancient clause of warranty, it is important to ascertain the effect of the latter, before we proceed to decide the effect of the former. It is undeniable, that the only recompense for the breach of a strict technical warranty, was a recovery of lands of equal value, by voucher, or writ of warrantia charts;. If there were no lands, the warrantee was without remedy. I think it equally' certain that, in estimating the value of the land lost by the warrantee, for the purpose of determining how much land was to be given to him in excambio or by way of recompense, the value was estimated as it was at the time of making the deed. The authorities have been cited by my brother Carr. Indeed, I do not understand that any one contends, that, either on voucher or writ of warrantia chartse, any increased value on account of buildings, or discovery' of mines &c. was to be taken into the estimate: and it would seem tó me, that, if the purchaser of lands was not to be compensated by the warrantor, for the value of even necessary buildings, on which he had expended his own money, he would have still less claim to be compensated for the increased value of the land growing out of accidental circumstances happening after the purchase. And the law is so laid down in the year book, 30 E. III., 14, b; 22 Vin. abr. Voucher, T. b, pi. 4, p. 14S. “If a man grants a ward, which creates a warranty in law, if after the grant other lands descend to the ward, by which he is of much greater value, yet he shall not render in value according to that, but only according to the value at the warranty created, though all the ward and marriage passes at the warranty created; for it is better by the descent after.” Such, then, was the effect of the ancient clause of warranty’, viz. that the person evicted was to be compensated *398 only in lands, and that the value of the lands lost was to be estimated as at the time when the deed was made; and this compensation could only be recovered on voucher or warrantia chart®.
*And thus the law continued, until comparatively modern times, when personal covenants were introduced into conveyances of land, as auxiliary to or as substitutes for the ancient warranty. Blackstone, in his commentaries (vol. II., p. 304), states the reason for the introduction of them, and says, that “the personal assets, as well as the real, are likewise pledged for the performance ot the covenant; which makes such covenant a better security than any warranty.” If, by these covenants, it was intended to change the standard of compensation, or if these covenants, or any of them, have really had that effect, it is very strange that so accurate a writer should have failed to advert to it; particularly, when he was engaged in detailing the comparative advantages of the covenants on one side, ánd of the warranty on the other. But Blackstone is not singular in his silence as to any such effect of the modern covenants. I have met with no such intimation in any book of english law; nor have I seen, even a complaint of the ancient standard of compensation. If so important a change in the law had been effected by the introduction of these covenants, it is impossible that the books should afford no traces of it. I infer, therefore, confidently, that though these covenants give a claim to a compensation in money, and not in land, and though they bind the personal as well as the real estate of the warrantor, for that compensation,, yet the standard of compensation, based upon the principles of justice and sound policy, has undergone no change, but remains, as formerly, the value of the land at the” time of making the deed. The land, as it then stood, was the subject of the contract between the parties: it was all that the vendor sold, and all that the purchaser bought: its then value was all that the purchaser paid, and all that the vendor received : it is, therefore, all that the purchaser ought to reclaim from the vendor, in case he loses the land. This standard is strongly recommended by its certainty, also: the parties know the ground on which it places them, and that ground is not liable to be changed by chance or accident.
*It is said, however, that an action of covenant lies on these covenants; and that, in covenant, the plaintiff is entitled to recover according to the loss he has really sustained. This position is sometimes found in the books. But it is not to be understood literally. There are very few cases, if any, in which the damages, even in ordinary actions of covenant, are not regulated by certain fixed rules, without any regard to the actual loss sustained by the party. Thus, in all covenants for the payment of money, the money which ought to have been paid, with the interest upon it, is the true standard of the damages recovered, though the damages actually sustained may have been a hundred times greater. In all executory contracts for the delivery of personal property, at a future day, the established standard of damages, is the value of the property, at the time and place, when and where it ought to have been delivered. In all executory contracts for the conveyance of land at a future time, the established measure of damages, according to the unvarying decisions of this court, is the purchase money. So, also, as I conceive, the law has wisely-ordered, that on a covenant to warrant and defend the title of land, the standard of damages shall be the value of the land, at the time of the sale, as ascertained by the purchase money, where that can be known.
I do not say that this rule is perfect, or that it will, in its application, be always free from objection: that merit cannot be claimed for any human regulation. But I am of opinion, that it is the rule which the law has established, and is the best rule that could have been established. If the parties choose to agree upon a different rule, it is competent to them to do so, by suitable special stipulations. In the absence of such special stipulations, the general rule must prevail.
I have only to add one other remark, in relation to the severity with which, it is supposed, the rule may sometimes operate on the purchaser of land, who, on the faith of his purchase, has erected valuable improvements thereon. It *is true, that the rule absolves the fair vendor from all obligation to pay for them. But it does not follow that the vendee will always be without redress. Judge Green, in Stout v. Jackson, has shewn how far he may, even in a court of law, set off the value of the improvements against the claim for mesne profits. But courts of equity will, sometimes, go much farther, and will not permit the rightful owner of the land to have the benefit of the improvements, without making a just compensation for them. And this court has gone so far as to restrict the claim of even the rightful owner of the land, to the value of the land in its unimproved state; permitting both the land and the improvements to remain with the person who made the improvements, or in the hands of his assignee. Southall v. M’Keand, 1 Wash. 336. How far courts of equity will extend relief in other cases, remains to be decided when suitable cases shall present the question. Upon the whole, I am for reversing the judgment.
BROOKE, P.
If the bill of exceptions in this record, though only signed, not sealed,, by the judge as the statute requires (1 Rev. Code, ch. 133), is to be considered as properly allowed by the judge; and it is also to be intended, that he gave the instruction to the jury, which was asked for by the appellee’s counsel, though it is not expressly stated in the bill of exceptions that he did so; then, this case presents the point, which was very elaborately argued, and decided, by a majority of the court (though I did not think the precise question arose) in the case of Stout v. Jackson. Upon that point, I have very little to add to what I said in that case. I think, after the greater light which has been shed on the subject by the bar and the bench, it must be admitted, that the value *399 in land, recovered by the warrantee on a technical warrant}’ at common law, was the value of the land warranted at the time the conveyance with warranty was executed. This, I think, is fully demonstrated by the pleadings to be found in the old books, to which I referred in my opinion in Stout v. Jackson. And that the xland recovered by the warrantee, as compensation for that which was warranted to him and of which he had been evicted, was valued as at the time of the eviction, is also demonstrated, I think, by the forms of the process, by which he was put into possession of the land recovered in lieu of the land lost. The writs of habere facias seisinam ad valentiam directed the sheriff to deliver lands of a certain annual value, at the then present value, I presume, since no other time was referred to by the writ. This being the settled law as to the measure of compensation for the breach of the ancient technical warranty, the question is, whether the covenants introduced into conveyances at a later period, were intended to give the covenantee an indemnity of a greater value than that given by the technical warranty? I think it quite obvious, that these covenants were introduced for a very different purpose; not to increase the amount of the indemnity in case of eviction, but to supply some defects in the technical warranty. That gave no remedy against the personal estate of the warrantor: it could be enforced only against the warrantor and his heirs : and if there were lands in the seisin of the warrantor, when the habere facias seisinam ad valentiam issued, there could be no recovery against him. So, also, when the writ of warrantia charlas was resorted to, the warranty was unavailing, if the war-rantor had no lands at the time of the writ purchased. F. N. B. 134. These were obvious objections to a reliance on the old warranty alone, for indemnity upon eviction of the land warranted, which became glaring when personal property came to be of more consideration, than in ancient times when the warranty was relied on for indemnity. The argument, that personal covenants having been introduced for the assurance of the title, these ought to be governed by the general principles of the common law touching other covenants, is plausible, but not sound. In a case in which there is a technical warranty and these personal covenants also, if the law’ applicable to the warranty might be departed from, and the law applicable to covenants in other cases '"might be applied to the personal covenants for the assurance of the title, an advantage would be given to the covenantee, which was certainly not in the contemplation of the parties : if the lands have fallen in value, he may resort to the warranty to recover the value at the time of the conveyance: if they have risen, he may resort to the personal covenants, to recover the value at the time of eviction. Now, it is impossible the parties should have intended, that there should be two measures of compensation. For these reasons, and for those which I stated in Stout v. Jackson, I think it very clear, that the personal covenants introduced into modern conveyances, were so introduced only for the purposes above mentioned, and not with any view to vary or increase the amount of the indemnity to the covenantee; and the case of Pomery v. Partington satisfies me, that such is the understanding of the law op the subject in Westminster hall. I conclude, therefore, that the true measure of damages, is the value of the land at the time of the warranty or covenants executed, and that the amount of the purchase money ascertains that value, unless a greater value can be proved; to which may be added the damages recovered of the warrantee or covenantee, upon his eviction. Whether he may also recover interest on the purchase money, will depend on the amount of the profits recovered of him; if none have been recovered, no interest should be allowed, as the profits will generally be an equivalent for the interest.
The judgment entered by this court was to the following effect: The court is of opinion, that, upon the facts stated in the bill of exceptions, the true measure of damages was the price given for the land at the time of the conveyance thereof by Threlkeld to Bronaugh, with interest thereon from the date of the actual eviction of Fitzhugh, by the entry of those entitled, and the costs expended by him in the action in which he was evicted, and such damages as he or his representatives may have paid, or may be shewn to be clearly liable to pay: and that the judgment is erroneous. ^Therefore, it is considered, that the - same be reversed &c. And it is ordered, that the verdict be set aside, and the cause remanded &c. for a new trial to be had therein, upon which no such instruction as that stated in the bill of exceptions, is to b'e given.